680 F.2d 382
 82-2 USTC P 9467
 E. G. WILLIAMS and Barbara Williams, Plaintiffs-Appellants,
v.
UNITED STATES of America, Defendant-Appellee.
J. M. PATTERSON and Louise Patterson, Plaintiffs-Appellants,
v.
UNITED STATES of America, Defendant-Appellee.
Melba Davis GREENLEE, Trustee, Trust under will of Geraldine
T. Davis, Plaintiffs-Appellants,
v.
UNITED STATES of America, Defendant-Appellee.
 No. 81-1095.
 United States Court of Appeals,
Fifth Circuit.
 July 14, 1982.
 
 Ben A. Douglas, Fort Worth, Tex., for plaintiffs-appellants.
 John F. Murray, Acting Asst. Atty. Gen., Michael L. Paup, Chief, Appellate Section, Gary R. Allen, David English Carmack, Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellee.
 Appeal from the United States District Court for the Western District of Texas.
 Before BROWN, GOLDBERG and GEE, Circuit Judges.
 GOLDBERG, Circuit Judge:
 
 
 1
 Taxpayers attempted to deduct from personal income partnership losses that were incurred prior to the time the taxpayers acquired their partnership interests. The district court held that taxpayers could deduct only those losses which accrued after the date of their entry into the partnerships. We affirm: taxpayers would like to play a game of musical chairs with partnership interests and losses, but the movements of the game do not conform to our contemporary Codal choreography.
 
 FACTS AND PROCEEDINGS BELOW
 
 2
 The relevant facts are stipulated. Taxpayers[1] became limited partners in two housing construction projects, called "Phase II" and "Phase IV", undertaken by the New York State Urban Development Corporation ("U.D.C.") and a private developer, Sovereign Construction Co., Ltd. ("Sovereign").[2] Taxpayers acquired their partnership shares near the end of 1974.[3] In exchange for their contribution of 5% of the project funds, the partnership agreements allocated 95% of the partnership profits and losses to the limited partners.[4] Both Phase II and Phase IV, using the accrual method of accounting, reported losses in excess of one million dollars for the 1974 tax (calendar) year.[5]
 
 
 3
 Taxpayers, utilizing the cash method of accounting, took as deductions on their individual returns their pro rata shares of the losses incurred by Phase II and Phase IV during the entire year of 1974. The Internal Revenue Service ("IRS") assessed deficiencies on the grounds that taxpayers could only deduct those partnership losses incurred after they had entered the partnerships. Plaintiffs paid the deficiencies and brought suit for a refund.[6] The district court granted summary judgment in favor of the IRS, and taxpayers brought this appeal.
 
 ISSUES ON APPEAL
 
 4
 Taxpayers contend that under the provisions of the Internal Revenue Code pertaining to taxation of partnerships, as in effect during 1974, they were entitled to deduct their proportionate share of losses incurred by Phase II and Phase IV over the entire year, even though they did not acquire their partnership interests until the end of 1974. Alternatively, taxpayers contend that the losses incurred by Phase II and Phase IV had not yet "accrued" at the time taxpayers became limited partners because the partnerships had not yet decided to deduct, rather than capitalize, the losses. We will consider each argument in turn.
 
 
 5
 1. The Code. Taxation of income derived from partnerships is controlled by the provisions of Subchapter K (Sec. 701 et seq.) of the Internal Revenue Code of 1954.[7] Under those provisions, income is not taxed to the partnership as an entity. Rather, the individual partners pay tax on partnership income (or deduct partnership losses) in accordance with their distributive shares of that income (or loss). See Sections 701 and 702.
 
 
 6
 Generally, a partner's distributive share of income and loss is determined by the partnership agreement. See section 704(a). There are exceptions, however. A partnership agreement's allocation of any item of income or loss is not effective if its purpose is "the avoidance or evasion of any tax imposed by this subtitle." Section 704(b)(2).
 
 
 7
 Section 706(c)(2)(B) controls the taxation of partnership income with respect to "a partner who sells or exchanges less than his entire interest in the partnership or with respect to a partner whose interest is reduced ..." When a partner is in this situation, his or her distributive share of partnership income or losses "shall be determined by taking into account his (or her) varying interests in the partnership during the taxable year."
 
 
 8
 Section 706(c)(2)(B) clearly prohibits precisely the arrangement which these taxpayers seek to affect. Under section 706(c)(2)(B), the distributive share of a partner who is a transferee of less than the entire interest of a transferor partner is determined in the same manner as that of the transferor partner. Moore v. Commissioner, 70 T.C. 1024, 1032 (1978). Accordingly, losses incurred by a partnership prior to a shift in partnership interests are deductible by the transferor partners in accordance with their then-existing partnership interests. Losses incurred by the partnership following a shift in partnership interests are deductible by the transferor and transferee partners in accordance with their newly-determined partnership interests. But losses accruing prior to a transfer of partnership interests cannot be assigned to the transferee. Thus, section 706(c)(2)(B) has consistently been construed to prohibit retroactive allocation of a full year's partnership losses (or income) to a taxpayer who was a member of the partnership for only part of the tax year, notwithstanding provisions of a partnership agreement to the contrary. See Rodman v. Commissioner, 542 F.2d 845 (2d Cir. 1976); Richardson v. Commissioner, 76 T.C. 512 (1981); Marriot v. Commissioner, 73 T.C. 1129 (1980); Moore v. Commissioner, supra.[8]
 
 
 9
 The varying interest rule set forth in section 706(c)(2)(B) accords with a fundamental principle of our graduated income tax system: the so-called "assignment of income" doctrine. Under this doctrine, which is applicable to allocation of partnership income to partners, see U. S. v. Basye, 410 U.S. 441, 93 S.Ct. 1080, 1086, 35 L.Ed.2d 412 (1973), income is taxable only to the person who earns it. Helvering v. Horst, 311 U.S. 112, 116, 61 S.Ct. 144, 147, 85 L.Ed. 75 (1940). One may not avoid taxation by assigning income to another: the tax laws do not permit arrangements by which "fruits are attributed to a different tree from that on which they grew." Lucas v. Earl, 281 U.S. 111, 115, 50 S.Ct. 241, 74 L.Ed. 731 (1930). A necessary corollary is the principle that a loss is deductible only by him or her who actually sustains it. "Just as the assignor of income cannot escape taxation by an anticipatory assignment thereof, the transferee of losses can gain no tax advantage by the transfer." Moore v. Commissioner, 70 T.C. at 1032. Thus, the courts have recognized that partnership agreements allocating to a new partner a portion of partnership profits or losses attributable to the period prior to the partner's entry into the partnership violate the assignment of income doctrine. See Rodman v. Commissioner, supra at 857; Moore v. Commissioner, supra at 1032.
 
 
 10
 With regard to section 706(c)(2)(B), appellants have but one reed to lean upon, and it is a slender reed indeed. Their position is that section 706(c) (2)(B) has no application to incoming partners who acquire their partnership interests by capital investment, rather than by purchase of existing partnership shares. Both Marriot, supra; and Moore, supra involved purchases by incoming partners of partnership interests from existing partners. Those purchases were accordingly controlled by section 706(c)(2)(B), which applies to "a partner who sells or exchanges less than his entire interest in the partnership;" and by implication, to a partner who buys less than an entire interest. In the instant case, however, taxpayers acquired their interests directly from their partnership by capital investment. Therefore, taxpayers argue, the interpretation of section 706(c)(2)(B) set forth in Moore and Marriot has no application to this case.
 
 
 11
 Section 706(c)(2)(B) applies to "a partner whose interest is reduced;" and thus, by implication, to an incoming partner who acquires his interest by the reduction of existing partners' proportionate shares. As part of the Tax Reform Act of 1976, section 706(c)(2)(B) was amended. A parenthetical phrase was inserted so that the statute now applies to "a partner whose interest is reduced (whether by entry of a new partner, partial liquidation of a partner's interest, gift or otherwise) ..." section 706(c)(2)(B) (emphasis indicates language added by amendment).
 
 
 12
 Appellants concede that section 706(c)(2)(B), as amended, prohibits the retroactive allocation of losses provided for in the Phase II and Phase IV partnership agreements. They argue that since the amendment to section 706(c) (2)(B) did not take effect until 1976, it was not, in terms, applicable to the tax year here in dispute. Appellants further contend that since section 706(c) (2)(B) was not expressly applicable to their 1974 acquisition of partnership interests, it follows that the statute was necessarily inapplicable.
 
 
 13
 This very argument was considered and rejected in Richardson v. Commissioner, supra. In that case, the Tax Court held that the 1976 amendment to section 706(c)(2)(B) codified, but did not modify, prior law, and that the clarifying language was equally applicable to a case arising prior to 1976.[9] See Richardson v. Commissioner, 76 T.C. at 523-524. We agree with the Tax Court's analysis of this issue.[10]
 
 
 14
 It is clear that with the entrance of taxpayers into Phase II and IV, the existing partners' shares were diminished. Although the overall partnership pie was enlarged by the equity capital contributed by the incoming partners, each partner's pro rata slice of the pie was reduced. Thus, the existing partners' shares were "reduced" within the meaning of section 706(c)(2)(B) as it was written in 1974, without the 1976 amending language.
 
 
 15
 Appellants' position must be that, prior to 1976, the word "reduced" in section 706(c)(2)(B) did not encompass reduction of an existing partner's proportionate share by the entrance of new partners. Yet appellants can cite neither judicial authority nor common sense[11] to support such a construction. They are unable to explain what "reduced" could have meant prior to 1976, if not reduction of partnership shares through entrance of new partners. The 1976 amendments to section 706(c)(2)(B) are certainly helpful in clarifying and making explicit the meaning of that section. (Those who labor in the field of tax learn to welcome guidance in any guise.) However, we find that the amendments were not intended to, and do not, alter the preexisting meaning of that provision. Therefore, under section 706(c)(2)(B) as in effect during the tax year in issue, the varying interest rule for determining partnership shares prohibited retroactive allocation of partnership losses to incoming partners who acquired their partnership interests through capital investment. Finally, even if this case were not controlled by section 706(c) (2)(B), the assignment of income doctrine, discussed supra, would prohibit retroactive allocation to these taxpayers of losses sustained by Phase II and Phase IV prior to taxpayers' acquisition of partnership shares.
 
 
 16
 2. The Timing of Losses. Appellants take the position that even if section 706(c)(2)(B) permits them to deduct only losses sustained after their entrance into Phase II and Phase IV, they are still entitled to deduct the bulk of the partnerships' 1974 losses. Taxpayers contend that under section 266 of the Code, Phase II and Phase IV had the option to capitalize, rather than deduct, certain of its 1974 expenses, including interest payments and advertising costs, made during periods of building construction. Thus, no "loss" existed until the partnerships elected, or failed to elect, to capitalize. Since the partnerships had not exercised their option to capitalize before December 31, 1974, the losses, according to appellants, came into existence only after their entrance into the partnerships.
 
 
 17
 In regard to this argument, the reed on which appellants rely is not merely slim, it is emaciated. Under the accrual method of accounting, used by both Phase II and Phase IV, "deductions are allowable for the taxable year in which all the events have occurred which establish the fact of the liability giving rise to such deduction and the amount thereof can be determined with reasonable accuracy." Sec. 1.446-1(c)(u), Treasury Regulations on Income Tax (1954 Code) (26 C.F.R.). It is this test which must determine at what point during the taxable year losses have been sustained by an accrual-method taxpayer, not the test suggested by appellants.[12]
 
 
 18
 Moreover, appellants' test for timing partnership losses would lead to the conclusion that taxpayers could not deduct any of the Phase II or Phase IV losses in tax year 1974. If the losses sprang into existence only when the partnership elected to deduct, rather than capitalize its 1974 expenses; the losses cannot be said to have existed until 1975, when the 1974 tax returns were presumably filed. Therefore, even under appellants' test for timing losses, we would not sustain these deductions for the 1974 tax year.
 
 
 19
 Finally, appellants attempt to justify the deductions by pointing to their position vis-a-vis the other Phase II and Phase IV partners at year end. Taxpayers contend that on the day they entered Phase II and Phase IV by providing equity capital for the construction projects, they, and not the pre-existing partners, became liable for the partnerships' losses. Thus, at year end, the pre-existing partners had no capital at risk, and no liability for loss: the risk and liability all lay with the incoming partners.
 
 
 20
 In Richardson v. Commissioner, supra, taxpayers acquired shares in a cash-method partnership by contributing capital. Taxpayers entered the partnership on December 31, 1974, and on that same day, paid many of the partnership's outstanding bills. Taxpayers were allowed to deduct the payments as losses on their 1974 tax returns. The Tax Court reasoned that since the partnerships utilized the cash method of accounting, the losses did not actually occur until the bills were paid on December 31, 1974, after the date of taxpayers' entrance into the partnership. Richardson v. Commissioner, 76 T.C. at 527. However, under the accrual method of accounting used by Phase II and Phase IV, the deductible losses here in question accrued prior to taxpayers' entry into the partnership, even if the expenses generating the losses had not actually been paid at the time taxpayers acquired their shares.[13]
 
 
 21
 Appellants contend that the loss allocations in the partnership agreements should be sustained for tax purposes because they are reasonable and reflect "economic reality." While a personal and subjective view of reality may be celebrated in the arts, such creativity has no place in the literal and unimaginative world of tax. The economic reality of this case is that none of the equity capital contributed by taxpayers as incoming partners generated the losses incurred by Phase II or Phase IV prior to the taxpayers' entry. Until taxpayers entered the partnerships, Sovereign provided the equity capital, and was liable, for any losses incurred by Phase II and Phase IV. Hence, taxpayers have no claim based on "economic reality" to deductions for losses which pre-dated their entry into Phase II and Phase IV.
 
 CONCLUSION
 The judgment of the district court is
 
 22
 AFFIRMED.
 
 
 
 [1]
 Appellants E. G. and Barbara Williams ("Williams"), J. M. and Louise Patterson ("Patterson") and Melba Davis Greenlee, Trustee ("the Trust"), will be referred to collectively as "taxpayers." Barbara Williams and Louise Patterson are parties by virtue of having signed joint income tax returns with their husbands
 
 
 [2]
 The district court summarized the details of the partnerships' history as follows:
 A partnership was formed between ... U.D.C. and Sovereign ... for the construction of apartment houses on Roosevelt Island for low and middle income families. Sovereign was the private developer and general contractor for two housing projects known as North Town Phase II (Phase II) and North Town Phase IV (Phase IV). The U.D.C. provided the project funds. In 1974, Sovereign and the U.D.C. formed limited partnerships with investors who provided equity capital over and above the loans from the U.D.C. Thus, the U.D.C. ultimately supplied 95% of the project funds for both Phase II and Phase IV; the remaining 5% of the monies came from the equity capital invested by the limited partners. Sovereign and a U.D.C. subsidiary acted as general partners....
 The Trust became a limited partner in Phase II. Williams and Patterson invested in Phase IV through a Texas general partnership, Basin Investors, which was formed for the purpose of investing in Phase IV.
 
 
 [3]
 The Trust became a limited partner in Phase II on September 30, 1974. Williams and Patterson, through Basin, entered Phase IV on December 30, 1974
 
 
 [4]
 The limited partners in Phase IV were allocated 99% of the partnership's profits and losses. Of that amount, 95% was allocated to Basin. Williams and Patterson each had a 15% interest in Basin's profits and losses. The limited partners in Phase II were allocated 95% of its profits and losses; 10% of this amount was allocated to the Trust
 
 
 [5]
 The Phase II partnership reported a loss of $1,138,233 for the calendar year 1974; the Phase IV partnership reported a $1,159,879 loss. The losses consisted primarily of interest on building loans, and advertising expenses. Because the housing projects were in the construction phase, the partnerships had no rental income in 1974
 
 
 [6]
 Jurisdiction was based on 28 U.S.C. § 1346(a)
 
 
 [7]
 All statutory references are to the Internal Revenue Code of 1954, as in effect during 1974, unless otherwise indicated
 
 
 [8]
 It is important to note that in this case, we are dealing solely with allocation or distribution of profits and losses occurring (accruing) prior to a transfer of partnership interests during the tax year. We are not dealing with-and express no opinion on-the allocation or distribution of losses as prescribed by a partnership agreement when the losses occurred (accrued) wholly within the tax year and when the partnership agreement concerns individuals who were partners for the whole of the tax year
 
 
 [9]
 As appellants point out, the Joint Committee on Taxation, in its explanation of the 1976 amendment to section 706(c)(2)(B), stated "the committee does not intend that any inference be drawn as to the propriety or impropriety of a retroactive allocation (of partnership losses) under present law." Staff of Joint Committee on Taxation, 94th Cong., 2d Sess., General Explanation of the Tax Reform Act of 1976, reprinted in 1976 U.S.Code Cong. & Ad.News 3017, 3020. The Committee was of the opinion that it was "unclear" whether section 706(c)(2)(B) in its preamendment incarnation required application of the varying interests rule to partners acquiring an interest directly from a partnership. It has been suggested that the uncertainty surrounding section 706(c)(2)(B) sprang from an unpublished Tax Court opinion allowing a retroactive loss allocation to a new partner. See Moore v. Commissioner, 70 T.C. at 1028 n.3. Unfavorable commentatory has since caused the Tax Court to disavow that unfortunate aberration in the history of section 706(c)(2)(B) analysis. See Moore, supra. See also Richardson, supra; Marriott, supra. In any event, we hold today that any uncertainty which may have muddied the waters of section 706(c)(2)(B) prior to the clarifying light of the 1976 amendment must be resolved against the position advocated by appellants
 
 
 [10]
 Of course, we express no opinion as to the Tax Court's decision on other issues raised in Richardson v. Commissioner, supra, which is now pending appeal to this Court
 
 
 [11]
 Although we use "judicial authority" and "common sense" in the disjunctive, we do not mean to suggest that the two are mutually exclusive
 
 
 [12]
 It is true, as appellants point out, that if the 1974 expenses had been capitalized, rather than deducted, appellants would eventually have been able to deduct a part of the expenses as their pro rata share of the increased depreciation resulting from the buildings' increased tax basis and as their pro rata share of the amortized construction period expenses. Thus, so long as taxpayers remained partners, they might have derived some value from the capitalized 1974 expenses. But taxpayers chose not to capitalize; they chose to deduct. We cannot alter the tax laws to rectify a disadvantageous accounting decision
 
 
 [13]
 Taxpayers do not actually assert that the expenses were unpaid as of the date they entered Phase II and Phase IV, and there is no finding of fact on this point. It is not clear what losses taxpayers were liable for at the end of 1974; however, under the analysis set forth above, it is irrelevant